# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MEHMED BILIĆ,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:18-mj-478-CMR<br>Magistrate Judge Cecilia M. Romero |

This matter is before the undersigned in accordance with District of Utah Local Criminal Rule 57-15(e). Before the court is Plaintiff's, the United States of America's (Plaintiff or United States), Complaint for the Extradition of Defendant Mehmed Bilić (Defendant or Mr. Bilić) pursuant to an extradition treaty between the United States and Bosnia-Herzegovina (ECF 1).[1] Also before the court is Defendant's Motion to Dismiss (ECF 64). After consideration of the extensive written submissions,[2] as well as arguments presented by counsel at the extradition

---

[1] The country of Bosnia and Herzegovina is sometimes referred to informally as BiH, B&H, and Bosnia-Herzegovina. Pleadings in this case refer to the requesting country as Bosnia, another common and informal name for the country known as Bosnia and Herzegovina. The court has elected to use the term Bosnia-Herzegovina.

[2] The court carefully considered the Complaint (ECF 1), the Government's Memorandum of Law in Support of Extradition (Extradition Request) (ECF 18), Defendant's Response to Government's Memorandum of Law in Support of Extradition (Response) (ECF 28), the Government's Reply to Defendant's Response to Government's Memorandum of Law in Support of Extradition (Reply) (ECF 40), Defendant's Sur-Reply to Government's Reply to Defendant's Response to Memorandum of Law in Support of Extradition (Sur-Reply) (ECF 45), the Amicus Brief in Opposition to Government's Memorandum of Law in Support of Extradition (Amicus Brief) (ECF 52), the Government's Response to Amicus Brief (Response to Amicus Brief) (ECF 55), Defendant's Response Re: Brief of Amici Curiae (ECF 56), Amici's Reply to Government's response to Amicus Brief (Amici's Reply) (ECF 59), Defendant's Motion to Dismiss Complaint (Motion to Dismiss) (ECF 64), the Government's Response to Motion to Dismiss the Complaint (Response to Motion) (ECF 68), Defendant's Reply to Government's Response to Defendant's Motion to Dismiss (Reply to Motion to Dismiss) (ECF 78), Defendant's Brief re: Hearing on Certification of Extradition (Defendant's Brief) (ECF 67), the Government's Response to Defendant's Extradition Brief (Response to Brief) (ECF 79), Defendant's Reply to Government's Response to Defendant's Extradition Brief (Reply in Support of Brief) (ECF 80), Amici's Brief Regarding the Principle of Non-Refoulement (Brief re Non-Refoulement) (ECF 76), the Government's Reply to Defendant's Response and to Amicus Brief (Response re Non-Refoulement) (ECF

hearings,[3] and all exhibits and testimony admitted at these hearings, the court DENIES the Motion to Dismiss (ECF 64), the court DENIES the request to certify this matter for extradition on the basis of the political offense exception, and the court DISMISSES the Complaint for Extradition (ECF 1).

## I.    BACKGROUND

Bosnia-Herzegovina requests that Mr. Bilić be extradited pursuant to its extradition treaty with the United States, the Treaty Between the United States and Servia for the Mutual Extradition of Fugitives from Justice, U.S.-Yugo., Oct. 25, 1901, 32 Stat. 1890 (the "1902 Treaty") (ECF 1, Ex. 1). Bosnia-Herzegovina alleges that Mr. Bilić engaged in war crimes in July 1992 in the village of Večići. At the time, the region was engaged in a civil war as discussed in more detail elsewhere in this Order. According to Bosnia-Herzegovina, in July and August 1992 members of Bosniak-Croat forces, which included Mr. Bilić, captured six Bosnians Serbs in the municipality called Rastnik. Bosnia-Herzegovina alleges that the group of Bosniak-Croat forces, including Mr. Bilić, engaged in torture and war crimes against the six Bosnian Serb detainees (ECF 1). The alleged conduct included beatings, and the death of two detainees as a result of the injuries they sustained (ECF 1).

Later in 1992, Mr. Bilić was incarcerated in a concentration camp under the control of the Bosnian Serbs (Def.'s Hr'g Ex. C, E) as a prisoner of war. The Ministry of Defense issued a certificate in March 1993 affirming that Mr. Bilić was being held in a camp, "based on a list of persons being held . . . . which we got from the aggressor's side for the purposes and needs of the Commission for the exchange of prisoners of war" (Def.'s Hr'g Ex. C). In 1993, he was extricated

---

81).
[3] The court held an Extradition Hearing on November 14, 2019 (ECF 71) which continued on December 2, 2019 (ECF 74) (Extradition Hearing).

from that camp by the International Committee of the Red Cross (the Red Cross) as part of a prisoner exchange (Def's Ex. C, D, E). In July 1993, the United Nations High Commissioner for Refugees issued a certificate that Mr. Bilić was under the protection of that office (Def.'s Hr'g Ex. D). On July 22, 1993, Mr. Bilić applied for refugee status and in that application, he described some of the events of 1992 (Def.'s Hr'g Ex. E). He explained in that application and its supplemental materials that he is a Bosnian Muslim; that his village, Večići, was surrounded by Serbian armed forces; that he and others were captured by Serbian soldiers when he tried to escape; that he was taken to a school gymnasium where he was beaten and interrogated; that he was later transferred to other camps; and he was later rescued by the Red Cross (Def.'s Hr'g Ex. E). He also explained he had nowhere to return to in Bosnia because his house was destroyed by the Serbian forces who drove all Muslims out of Večići (Def.'s Hr'g Ex. E). He and his family obtained refugee status. In that process, Mr. Bilić asked to be relocated to a place that would be safe for his children (Dec. 2, 2020 Hr'g Test. at 1:13–:25). The family was relocated to the United States (*Id.*).

Mr. Bilić submitted those same refugee application materials, that were filled out shortly after his capture and release in 1993, with his Application for Naturalization that he submitted to United States in 2004. (Def.'s Hr'g Ex. E). He became a naturalized citizen of the United States on January 12, 2005 (Ex. E). He works as a carpenter and is a member of the Southwest Regional Council of Carpenters (ECF 11-4, -5). He is married, his family lives in Utah, and he is active in the local community (ECF 11-7, -8, -9). Mr. Bilić returned to Bosnia-Herzegovina twice after his relocation to visit his mother, once in 1998 and another time in 2002. (Dec. 2, 2020 Hr'g Test. at 1:25–2:05). Both trips were made with his Bosnian passport (*Id.*; Def.'s Hr'g Ex. F). At no point was he detained by the government in Bosnia-Herzegovina (Dec. 2, 2020 Hr'g Test. at 1:25–2:05).

In 2008, sixteen years after the alleged events, Bosnia-Herzegovina issued a warrant for

Mr. Bilić's arrest charging him with war crimes against civilian population, in violation of Article 142(1) of the Criminal Code of the Socialist Federative Republic of Yugoslavia, and war crimes against prisoners of war in violation of Article 144(1) of the same code (ECF 1, Pl.'s Hr'g Ex. 2 at subsec. D (Dec. 30, 2008 Order to Issue an Arrest Warrant for the Suspects)).[4] Mr. Bilić was not arrested at that time because he was no longer in Bosnia-Herzegovina (ECF 1). In 2009, three of the Bosniak-Croats alleged to be involved in the events were convicted of war crimes in a court in Bosnia-Herzegovina (ECF 1). In 2015, Bosnia-Herzegovina provided documents to the United States requesting extradition of Mr. Bilić (Pl.'s Hr'g Ex. 2). As noted above, those papers alleged that Mr. Bilić violated Article 142(1) and 144(1) of the Criminal Code of the Socialist Federative Republic of Yugoslavia for crimes against civilians and against prisoners of war (Pl.'s Hr'g Ex. 2 at subsec. D). The United States certified those extradition request documents in 2016 (Pl.'s Hr'g Ex. 1 at Billic_Ext_0002 to _0005; ECF 1-1 at pp. 2, 5 of 65; Pl.'s Hr'g Ex. 1 at p. 1 (Foreign Service Certificate)).

The United States then initiated the filing of the Complaint in this court and an arrest warrant was issued (ECF 1). Mr. Bilić was arrested on September 5, 2018 in the District of Utah (ECF 10). Following his initial appearance, the court ordered Mr. Bilić detained (ECF 8) and he remained in detention until the court granted (ECF 86) Defendant's Second Motion to Reconsider Detention (ECF 82). The court ordered Mr. Bilić released in light of the procedural history and complexity of the issues presented, coupled with special circumstances related to the COVID-19 global health pandemic (ECF 86). Since his release, Mr. Bilić has fully complied with his

---

[4] The six hearing exhibits provided by the United States each included numerous subparts and those subparts were voluminous but not marked or paginated. Counsel explained at the Extradition Hearing that the exhibits are provided from the Secretary of State in an unusual format that is difficult to manage. Some subparts in the exhibits were identified and marked by counsel during the hearing which the court makes reference to when possible. The court has also attempted to identify the documents with some specificity.

conditions of release.

## II.    DISCUSSION

### A.  Framework for Extradition

Extradition is primarily an executive responsibility with a specially-defined role for a judicial officer. *E.g.*, *United States v. Perilla Umbarila*, 562 F. Supp. 3d 729, 734 (C.D. Cal. 2022). "The power to extradite derives from the President's power to conduct foreign affairs." *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993) (citing U.S. Const. art. II § 2, cl. 2). Notwithstanding the Executive Branch's authority over matters of international diplomacy, Congress assigned the courts a particular role in the extradition process. 18 U.S.C. § 3184. That role is set forth by statute at 18 U.S.C. § 3184. Upon presentation of a complaint that a person within its jurisdiction has committed a crime in a foreign state covered by an existing treaty, the presiding court may issue a warrant to apprehend the person. *Id.* The person then appears before the court at for an extradition hearing, "to the end that the evidence of criminality may be heard and considered." *Id.*

After that hearing, the court is to either certify the matter for extradition or deny the certification. To certify extradition, the court must find all of the following five criteria are satisfied: (1) the court has jurisdiction to conduct extradition proceedings; (2) the court has jurisdiction over the person; (3) an extradition treaty is in force and effect; (4) the person is being sought for offenses for which the applicable treaty permits extradition; and (5) there is sufficient evidence to establish probable cause that the individual appearing in court is the person who committed the offense for which extradition is requested. *E.g.*, *Perilla Umbarila*, 562 F. Supp. 3d at 734–35; *United States v. Hidalgo*, No. 2:10-mj-165-PMW, 2011 WL 754270, at *4 (D. Utah Feb. 24, 2011) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). If the elements are met,

the magistrate judge must certify the extradition and has no discretion to decide otherwise. *E.g.*, *Perilla Umbarila*, 562 F. Supp. 3d at 735.

If the court certifies extradition, then the matter moves to the Secretary of State who ultimately decides whether to surrender the person to the requesting country. 18 U.S.C. §§ 3186, 3196. The person facing extradition cannot directly appeal the district court's extradition order but can challenge the order by filing a petition for a writ of habeas corpus. *E.g.*, *Pasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005); *Manrique v. O'Keefe*, Case No. 21-cv-08395-LB, 2022 WL 1212018, at *6 (S.D. Cal. April 22, 2022). A habeas review of an extradition order is limited to: (1) whether the extradition court had jurisdiction to conduct the proceeding and jurisdiction over the individual sought; (2) whether the extradition treaty was in force and the crime fell within the treaty's terms; (3) whether there was probable cause that the individual committed the crime; and (4) whether the crime fell within the political offense exception. *E.g.*, *Prasoprat*, 421 F.3d at 1013; *Manrique*, 2022 WL 1212018, at *6. If court denies the certification, then the United States and the requesting country can begin the extradition process again. *E.g.*, *Gill v. Imundi*, 747 F. Supp. 1028, 1039 (S.D.N.Y. 1990) (citing *In re Doherty*, 786 F.2d 491, 501 (2d Cir. 1986)). *See also Hooker v. Klein*, 573 F.2d 1360, 1366–68 (9th Cir. 1978) (analyzing whether the doctrine of res judicata applies to extradition proceedings).

The court's authority is limited to determining whether that evidence "is sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. While a court's role in an extradition proceeding is a limited role, that "is not to say that a judge in an extradition proceeding is expected to wield a rubber stamp." *E.g.*, *Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016); *In re Extradition of Khochinsky*, 116 F. Supp. 3d 412, 419 (S.D.N.Y. 2015). For example, the probable cause determination is uniquely in the court's hands,

not subject to deference to the executive branch. *Santos*, 830 F.3d at 1006–07. An extradition hearing does not decide guilt or innocence but is analogous to a preliminary hearing to determine the existence of probable cause for a criminal charge. *Id.* at 991–93. Courts also act within their authority by considering the evidence as it relates to the other elements, such as whether there is a valid treaty in effect and whether the political offense exception applies. *E.g.*, *In re Extradition of Nezirovic*, Civil Action No. 7:12MC39, 2013 WL 5202420, at *3 (W. D. Va. Sept. 16, 2013) (evaluating the evidence presented, and a failure to present evidence, to determine whether a treaty is valid); *Quinn v. Robinson*, 783 F.2d 776 (9th Cir. 1986) (evaluating the evidence presented to determine if the political offense exception applies).

### B. Evidentiary Concerns in Extradition Proceedings

The scope of evidence that can be admitted in an extradition hearing is pertinent to the analysis in this case. The Federal Rules of Criminal Procedure and the Federal Rules of Evidence do not apply at an extradition hearing. *E.g.*, *Santos*, 830 F.3d at 992; *Hidalgo*, 2011 WL 754270, at *2 (discussing Fed. R. Cr. P. 1(a)(5)(A) and Fed. R. Evid. 1101(d)(3)). Thus, as in a probable cause hearing in a domestic criminal matter, hearsay may be relied upon by the court. *Santos*, 830 F.3d 991; *Hidalgo*, 2011 WL 754270, at *2 *Id.* at *3. On one hand, the breadth of evidence that can be admitted without the restrictions of the Rules of Evidence may therefore appear to be a liberal standard. In this case, ample hearsay was admitted through exhibits, notably the materials to support the request for extradition (Pl.'s Hrg. Ex. 2).

On the other hand, the court may only admit "explanatory evidence," which is evidence that eliminates probable cause, but may not admit "contradictory evidence," which is evidence that merely conflicts with the government's evidence. *E.g.*, *Santos*, 830 F.3d at 992–93; *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("In practice, this line is not easily drawn, but the rule serves the

useful purpose of allowing the defendant 'to present reasonably clear-cut proof . . . of limited scope that has some reasonable chance of negating a showing of probable cause,' while preventing the extradition proceedings from becoming 'a dress rehearsal trial.'"). The line between the two types of evidence can be unclear. "The task of defining the precise boundary between admissible 'explanatory' evidence and inadmissible 'contradictory' evidence is entrusted to the sound discretion of the extradition judge. *Sandhu v. Burke*, No. 97 CIV. 4608 (JGK), 2000 WL 191707, at *6 (S.D.N.Y. Feb. 10, 2000). Contradictory evidence has been described as evidence "the credibility of which could not be assessed without a trial." *Santos*, 830 F.3d at 992–93. Contradictory evidence includes alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, because "this tends to call into question the credibility of the government's offer of proof." *Id.* at 993. By contrast, "the accused may testify 'to things which might have explained ambiguities or doubtful elements' in the government's case." *Id.*

In this case, the court was presented with both types of evidence. The court has considered explanatory evidence submitted by Mr. Bilić through exhibits, affidavits, and testimony (ECF 75). The court has excluded contradictory evidence including Mr. Bilić's denial in his testimony of being part of the beatings, which contradicts the United States' offer of proof and would have called into question credibility issues.

The court also excluded recantation evidence. Courts reach different results regarding the admissibility of recantation evidence. Some courts admit recantation evidence and others exclude it. *Hoxha*, 465 F.3d at 561–62 (discussing various cases addressing recantation testimony); *In re Extradition of Atuar*, 300 F. Supp. 2d 418, 427–31 (S.D. W. Virg. 2003) (discussing and distinguishing numerous cases in this area of extradition jurisprudence). Mr. Bilić proffered recantation evidence in this case (Def's Hr'g Ex. M). With its extradition request, the United States

submitted the written testimony from interviews conducted as part of criminal proceedings with the prosecutor's office in Banja Luka with four of the six detainees, three of whom mentioned Mr. Bilić's name (Pl.'s Hr'g Ex. 2). The four witnesses were Tepić Jelenko (Pl's Hr'g Ex. 2 at subsec. H); Durić Milenko (Pl's Hr'g Ex. 2 at subsec. I); Sakan Draško (Pl's Hr'g Ex. 2 at subsec. J); and Borislav Vasiljević (Pl's Hr'g Ex. 2 at subsec. K). Borislav Vasiljević did not mention Mr. Bilić (Pl's Hr'g Ex. 2 at subsec. K). Mr. Bilić provided written recantations from the three detainees who did mention his name: Tepić Jelenko, Durić Milenko, and Sakan Draško (Def's Hr'g Ex. M). While Defendant's Exhibit M was admitted without objection from the United States, in reviewing the information submitted the court excluded the recantation testimony of the three witnesses (Def's Hr'g Ex. M) as contradictory evidence presented by Mr. Bilić. The court notes that decision in this Order to preserve Mr. Bilić's objection regarding recantation testimony. (ECF 74, 75; Dec. 2, 2019 Hr'g Test. at approx. 2:55 to 3:10).

With the framework for extradition and the evidentiary limitations in mind, the Court evaluates the five requirements for extradition.

## A. This Court Has Jurisdiction over the Subject Matter

This court has subject matter jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. § 3184. The judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Both magistrate judges and district judges may render a certification under § 3184. *See*

*Austin v. Healey*, 5 F.3d 598, 601–02 (2d Cir. 1993). Here, Local Criminal Rule 57-15(e) of the United States District Court for the District of Utah expressly delegates to magistrate judges the authority to handle extradition matters. Moreover, at the Extradition Hearing, Defendant's counsel conceded the court's authority was not disputed.

### B. This Court Has Jurisdiction over Mr. Bilić

This court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 (stating a court "may, upon complaint made under oath, charging any person found within [its] jurisdiction, . . . issue [its] warrant for the apprehension of the person so charged"). The United States Marshals Service arrested Mr. Bilić in this district, and the court has held subsequent hearings regarding that arrest, detention, and terms of release. Because Mr. Bilić was "found within [this] jurisdiction," the personal jurisdictional requirement of 18 U.S.C. § 3184 is met. Mr. Bilić does not contest personal jurisdiction.

### C. An Extradition Treaty Is in Force and Effect

Mr. Bilić moves to dismiss the Complaint for Extradition, asserting there is no valid treaty (ECF 64) because (1) the area now known as Bosnia-Herzegovina was not part of the land that was known as Servia in 1901 and 1902, and (2) the United States Senate was not consulted regarding the 1902 Treaty. Similar arguments have been presented and rejected in other districts regarding the 1902 Treaty between the United States and Bosnia-Herzegovina.

The United States and the Kingdom of Servia signed an extradition treaty on October 25, 1901, and that treaty was entered into on June 12, 1902. As noted above, the treaty is commonly referred to as the "1902 Treaty." Under the state succession doctrine, a successor state may be bound by the treaty obligations of a prior state. *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 984 (citing *Sabatier v. Dabrowski*, 586 F.2d 866, 868 (1st Cir. 1978)). Mr. Bilić asserts that

Bosnia-Herzegovina is not the successor state and therefore it is not subject to the 1902 Treaty. The evidence he proffers in support was submitted with his Motion to Dismiss (ECF 64) and is corroborated in part by the materials submitted by the United States (ECF 68-1).

    1.  <u>History of Successor States in this Region</u>

In 1902, the land that comprises Bosnia-Herzegovina was not part of Servia. That land had formerly been part of the Ottoman Empire, and from 1878, it was subject to administration by the Austro-Hungarian government (ECF 64-1 at 3). In 1908, the Austro-Hungarian government formally annexed Bosnia-Herzegovina, an event which fueled nationalist tensions in the area (ECF 64-1 at 3). In 1914 and as a result of those nationalist tensions, the Austro-Hungarian Archduke Franz Ferdinand was assassinated in Sarajevo, the capital of Bosnia-Herzegovina—that event is generally accepted to be the trigger for World War I. (ECF 64-1 at 3). In 1918, after the end of World War I, the Kingdom of Servia was expanded to form the new Kingdom of Serbs, Croats and Slovenes. (ECF 64-1 at 3). In 1920, that kingdom was renamed the Kingdom of Yugoslavia. (ECF 64-1 at 3, 68-1 at ¶ 4). In 1946, after the end of World War II, it was renamed again to the Federal People's Republic of Yugoslavia. In 1963, the country was renamed the Socialist Federal Republic of Yugoslavia (ECF 68-1). The Socialist Federal Republic of Yugoslavia had six constituent republics: Slovenia, Croatia, Serbia, Bosnia-Herzegovina, Montenegro, and Macedonia. (ECF 64-1 at 5).

In 1991, the Socialist Federal Republic of Yugoslavia began to disintegrate (ECF 64-1 at 5–6). In 1992, Bosnia-Herzegovina declared its independence from the former Yugoslavia (ECF 64-1 at 6). Also in 1992, the United States recognized Bosnia-Herzegovina as an independent state and diplomatic relations followed (ECF 64-1 at 7, 68-1). A letter was sent from the 1992 president of Bosnia-Herzegovina affirming that prior treaty obligations that existed between the United

States and the Federal People's Republic of Yugoslavia would be fulfilled (ECF 68-1). That letter

has been recognized by federal courts as evidence of the 1902 Treaty. *Bašić v. Steck* (*Bašić I*), No.

5:12-CV-274-KKC, 2015 WL 4164901, at *4–6, *4 n. 6 (E.D. Ky. July 9, 2015) (discussing the

history of Yugoslavia, Bosnia, and the 1992 letter from and concluding Bosnia-Herzegovina is the

successor state to the 1902 Treaty).

    2.  <u>United States Jurisprudence Recognizes the 1902 Treaty</u>

While the area of Bosnia-Herzegovina was not part of the Kingdom of Servia in 1902, the

1902 Treaty has been consistently recognized by United States courts in extradition proceedings.

In 1954, when the area was called Federal People's Republic of Yugoslavia, the 1902 Treaty was

recognized through the successor state doctrine in *Ivancevic v. Artukovic* (*Artukovic I*), 211 F.2d

565, 566–75 (9th Cir. 1954). After the area became known as the Socialist Federal Republic of

Yugoslavia, the 1902 Treaty was recognized through the successor state doctrine. *Id. See also*

*Artokovic v. Rison* (*Artukovic III)*, 784 F.2d 1354, 1355 (9th Cir. 1986). In more recent decades,

from 1992 to 2011, the United States honored that 1902 Treaty by certifying extraditions on at

least four occasions. *In re Handanovic*, 829 F. Supp. 2d 979, 983–85 (citing *In re Extradition of*

*Bilanovic,* No. 1:08–mj–74, 2008 WL 5111846, at *6 (W.D. Mich. Dec. 3, 2008); *United States v.*

*Avdic,* No. CR 07–M06, 2007 WL 1875778, at *6 (D. S.D. June 28, 2007); *In re Extradition of*

*Sacirbegovic,* No. 03 CR Misc. 01, 2005 WL 107094 (S.D.N.Y. Jan. 19, 2005), *rev'd on other*

*grounds, Sacirbey v. Guccione* (*Sacirbey II*), 589 F.3d 52 (2nd Cir. 2009); and *Arambasic v.*

*Ashcroft*, 403 F. Supp. 2d 951, 954–55 (D. S.D. 2005) (finding the 1902 Treaty valid as to the

Republic of Croatia)). In the most recent decade, the 1902 Treaty continues to be recognized. *Bašić*

*II*, 819 F.3d at 898 n. 1 (recognizing the 1902 Treaty by agreement of the parties); *United States*

*v. Geordiadis*, 819 F.3d 4, 10 n.5, n.6 (1st Cir. 2016) (recognizing the 1902 Treaty applying to

relations between the United States and Croatia); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 217 (N.D.N.Y. 2013) (recognizing the 1902 Treaty applying to relations between the United States and Bosnia-Herzegovina).

The 2013 decision in *In re Extradition of Nezirovic* provides additional citation to jurisprudence recognizing the 1902 Treaty and notes that the successor state doctrine applies unless the successor state expressly rejects the treaty:

> Courts consistently recognize state succession with regard to extradition treaties, and **will presume state succession unless the successor state explicitly rejects a given treaty**. *Arambasic v. Ashcroft*, 403 F. Supp. 2d 951, 955 (D.S.D. 2005). Nezirovic presented no evidence that Bosnia has rejected the treaty between the United States and Serbia; and multiple courts examining the history of the Extradition Treaty have found that it is in full force and effect. *See, e.g.*, *Skaftouros v. United States*, 667 F.3d 144, 151 n. 10 (2d Cir. 2011) (Bosnia "is a successor to the Kingdom of Serbia and thus a successor party to the treaty of extradition between the United States and the Kingdom of Serbia"); *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) ("We have long held that the 1902 treaty is valid and effective now even though Yugoslavia did not exist as a political unit at the time the treaty was signed"); *In the Matter of the Extradition of Handanovic*, 829 F.Supp.2d 979, 986 (D. Or. 2011) ("[T]he 1902 treaty remains a valid extradition treaty between the United States and [Bosnia]...."); *In re Extradition of Azra Basic,* No. 5:11–MJ–5002, 2012 WL 3067466, at *3 (E.D. Ky. July 27, 2012) (re-affirming prior finding that the Extradition Treaty applies as to Bosnia); *In Re Extradition of Bilanovic*, No. 1:08–MJ–74, 2008 WL 5111846, at *6 (W.D. Mich. Dec. 3, 2008)(noting that "[n]o court has held otherwise"); *United States v. Avdic*, No. CR 07–M06, 2007 WL 1875778, at *2, *6 (D. S.D. June 28, 2007) (finding the Extradition Treaty in full force and effect).

*In re Extradition of Nezirovic*, 2013 WL 5202420, at *3 (emphasis added).

3.   1902 Treaty Remains in Force and Effect

As noted above, in his Motion to Dismiss Defendant asserts the 1902 Treaty is not valid because (1) the land comprising Bosnia-Herzegovina was not part of Servia in 1901 and therefore it cannot be a successor state, and (2) the Senate was never consulted concerning a treaty with

Bosnia-Herzegovina and therefore the Treaty does not apply to Bosnia-Herzegovina as a successor state to the Kingdom of Servia (ECF 64). Defendant emphasizes that the area now known as Bosnia-Herzegovina was once part of the Austro-Hungarian Empire and that treaties with that empire did not survive after the world war. Defendant also notes the Congressional Research Services Report and the State Department's official designation of "Treaties in Force" do not include an extradition treaty between with Bosnia-Herzegovina (ECF 64-7).

Defense counsel at the Extradition Hearing invited the court to not rely on past precedent that recognized the 1902 Treaty and instead to evaluate the geographic boundaries prior to World War I. The court is unable to do so. As noted above, federal courts have enforced the 1902 Treaty on numerous occasions after World War I, finding the 1902 Treaty was in full force and effect with Bosnia-Herzegovina as a successor state of Yugoslavia. *See, e.g.*, *Bašić I*, 2015 WL 4164901, at *4–6 ("Because every successive state between the Kingdom of Serbia and the Republic of Bosnia and Herzegovina accepted the Treaty, the Treaty remains in full force and effect. This finding is in line with every court that has confronted this issue, all of which have expressly or impliedly found the Treaty in effect between the United States and Bosnia."); *In re Extradition of Nezirovic*, 2013 WL 5202420, at *3 (citing the history of cases recognizing the 1902 Treaty). These extradition cases reflect that not only have United States courts and the Secretary of State long recognized the Treaty, but all successor states known as the former Yugoslavia have, regardless of the land's original status as part of the Austro-Hungarian Empire.

Second, the Congressional Research Services Report Mr. Bilić relies upon (ECF 64-7) includes a footnote regarding Bosnia-Herzegovina that states "The United States had an extradition treaty with the former Yugoslavia prior to its breakup (32 Stat. 1890). Since then, it has recognized at least some of the countries which were once part of Yugoslavia as successor nations." (ECF 64-

7 at 43 n. a). The footnote goes on to cite *Sacirbey I*, 2006 WL 2585561. Third, the United States has submitted an affidavit from the Attorney Advisor of the State Department's Office of Treaty Affairs (ECF 68-1) declaring that the Treaty remains in full force and effect is sufficient to satisfy this requirement. *See In re Rodriguez Ortiz*, 444 F. Supp. 2d 876, 882 (N.D. Ill. 2006) (relying on a similar declaration in finding a treaty with Mexico to be in force). Finally, no material has been presented to indicate that Bosnia-Herzegovina has explicitly rejected the 1902 Treaty pursuant to the rule in *In re Extradition of Nezirovic*, 2013 WL 5202420, at *3. Rather, in 1992 the then-president of Bosnia-Herzegovina affirmed the prior treaty obligations that existed between the United States and the prior republic (ECF 68-1).

After reviewing the materials presented, the arguments of counsel, and the large volume of case law regarding this same issue, the court concludes, consistent with its sister courts over the last century, that the 1902 Treaty is a valid treaty in force and effect between the United States and Bosnia-Herzegovina. On that basis, the court denies Defendant's Motion to Dismiss (ECF 64).

### D.  The Crimes Charged Are Not Extraditable Offenses as Political Offenses

The next step in the five-part analysis is to determine whether the offenses charged are extraditable offenses. Defendant alleges that the crimes alleged against him are non-extraditable political offenses (ECF 59, 67). Crimes of a political nature are specifically excluded as subjects for extradition under Article VI of the 1902 Treaty. 1902 Treaty, art IV (attached to Pl.'s Hr'g Ex. 1). United States courts have recognized that the 1902 Treaty includes the political offense exception. *E.g.*, *Ivancevic*, 211 F.2d at 575 n. 3.

Under the political offense exception, a fugitive cannot be extradited for crimes committed "in the course of and incidental to a violent political disturbance such as war, revolution or rebellion." *E.g.*, *Koskotas v. Roche*, 931 F.2d 169, 171 (quoting *Eain v. Wilkes*, 641 F.2d 504, 511

(7th Cir. 1981)). For a court to apply the political offense exception, the court must find (1) the occurrence of an uprising or other violent political disturbance at the time of the charged offense, and (2) a charged offense that is "incidental to," "in the course of," or "in furtherance of" the uprising. *E.g.*, *Quinn*, 783 F.2d at 797; *In re Extradition of Al-Nouri*, No. MJ-20-08033-PHX-MTM, 2022 WL 993781, at *14 (D. Ariz. Apr. 1, 2022). The crime must be incidental to and form a part of a political disturbance. It must be in furtherance of one side or another of a bona fide struggle for political power. *E.g.*, *U.S. ex rel. Karadzole v. Artukovic* (*Artukovic II*), 170 F. Supp. 383, 392 (S.D. Cal. 1959). The test is ideologically neutral: "[i]t is the fact that the insurgents are seeking to change their governments that makes the political offense exception applicable, not their reasons for wishing to do so or the nature of the acts by which they hope to accomplish that goal." *Quinn*, 783 F.2d at 804–05. The incidence test exists to (1) "protect acts of domestic violence in connection with a struggle for political self-determination" and (2) "not protect acts of international terrorism." *Quinn*, 783 F.2d at 806.

Political offenses generally fall within two distinct categories: pure political offenses and relative political offenses. *In re Extradition of Singh*, 170 F. Supp. 2d 982, 995–96 (E.D. Cal. 2001), *aff'd sub nom. Barapind v. Enomoto*, 360 F.3d 1061 (9th Cir. 2004), *on reh'g en banc*, 400 F.3d 744 (9th Cir. 2005), and *aff'd in part, rev'd in part and remanded sub nom. Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2005). Pure political offenses include treason, espionage, and sedition; these are acts aimed directly at the government and do not contain any of the elements of ordinary crimes. *Quinn*, 783 F.2d at 793–94. *See also* Restatement (Third) of Foreign Relations Law § 476 rep. n. 4 (Am. L. Inst. May 2022 update) (identifying prohibited speech or publication, unlawful assembly, unauthorized departure or attempted departure from the state, and forbidden worship as other pure political offenses). Relative political offenses, on the other hand, are

16

otherwise common crimes, including crimes of violence, committed in connection with a political act or common crimes committed for political motives or in a political context. *Quinn*, 783 F.2d at 794. The political offense exception applies when "the nexus between the crime and the political act is sufficiently close." *Id*. As noted above, the crime must be incidental to and form a part of political disturbances, in furtherance of one side or another in a bona fide struggle for political power. *E.g.*, *Artukovic*, 170 F. Supp. 383, 392.

The person claiming the political offense exception does not need to prove membership in the uprising group to invoke the political offense exception. *Quinn*, 783 F.2d at 811. The person claiming the exception bears the burden of proof. *In re Nezirovic*, 2013 WL 5202420, at *16. If that burden is met, the burden shifts to the United States to prove the crimes charged were not of a political character. *Id.*

1. Political Offense Exception Is Rarely Applied

The political offense exception is rarely applied. Because this court joins the limited body of jurisprudence finding that exception applies, a look at some of those cases which have found the exception applied is warranted. An early case recognizing the exception was *In re Ezeta*, 62 F. 972 (N.D. Cal. 1894). In that case, the country of El Salvador sought extradition of five people on the charge of murder of four individuals. The court found the violent conduct was committed during hostilities between contending forces after a coup in an unsuccessful effort to thwart a revolution. *Id.* As a result, the political exception applied, and the extradition was not certified. *Id.*

In *Ramos v. Diaz*, the political offense exception was applied to two Cuban revolutionaries accused of murder in 1959, immediately after the fall of the Batista government in Cuba as revolutionary forces were rounding up the alleged enemies of the now-fallen Batista government. 179 F. Supp. 459, 462–64 (S.D. Fl. 1959). Also in 1959, the political offense exception was applied

in *Artukovic*, 170 F. Supp. 383. In that case, Croatian leaders declared their independence from the Kingdom of Serbs, Croats and Slovenes. In the absence of a government and army in that period after independence was declared, Croat villages created their own civilian militias for their own protection. *Id.* at 392. The area was characterized by a long period of civil war. On remand from the United States Supreme Court, the district court determined the crimes charged were sufficiently incidental to the civilian militias and civil unrest to fall within the political offense exception. *Id.*

In *In re Doherty*, a court confronted some of the difficult issues within the political offense exception and found it did apply in the context of a death during a conflict. 599 F. Supp. 270 (S.D.N.Y. 1984). The United Kingdom sought the extradition of a member of the Irish Republic Army who had killed a British army captain during a skirmish in Belfast, Northern Ireland. *Id.* at 272. The *Doherty* court aptly noted:

> Not every act committed for a political purpose or during a political disturbance may or should properly be regarded as a political offense. Surely the atrocities at Dachau, Aushwitz, and other death camps would be arguably political within the meaning of that definition. The same would be true of My Lai, the Bataan death march, Lidice, the Katyn Forest Massacre, and a whole host of violations of international law that the civilized world is, has been, and should be unwilling to accept. Indeed, the Nuremberg trials would have no legitimacy or meaning if any act done for a political purpose could be properly classified as a political offense.

*Id.* at 274. The *Doherty* court went on to note that the political offense exception can apply to armed guerillas and is not limited to uniformed military personnel. *Id.* at 275. The exception is not dependent on who won or lost the political struggle. *Id.* The use of violence is also not dispositive. *Id.* The court then emphasized that violence against civilians, at department stores, taverns, and hotels would fall outside the political offense exception, although the court also explained that attacks against civilian representatives of government may fall into a more nuanced area. *Id.* at 275–76. The *Doherty* court then held that the death of the British army officer was "the political

18

offense exception in its most classic form." *Id.* at 276.

> The death of Captain Westmacott, while a most tragic event, occurred in the context of an attempted ambush of a British army patrol. It was the British Army's response to that action that gave rise to Captain Westmacott's death. Had this conduct occurred during the course of more traditional military hostilities there could be little doubt that it would fall within the political offense exception.

*Id.*

In more recent decades, *United States v. Pitawanakwat*, 120 F. Supp. 2d 921 (D. Or. 2000), the political offense exception applied to an individual convicted of armed confrontation with law enforcement during a 1995 protest by native people in Canada related to the historic dispossession of native people from their lands. While that case was not a violent uprising akin to a civil war, the court found it sufficiently violent and seeking a change in government structure to meet the incidence test and was therefore a political offense. *Id.* at 934–36.

2. <u>There Was a Violent Political Uprising at the Time of the Alleged Offense</u>

The first part of the two-part incidence test requires there be a political uprising. This is a geographic component; the alleged conduct must occur with the borders of the country or territory where the citizens seek to change their government. *Quinn*, 783 F.2d at 806. In *Quinn*, the Ninth Circuit found the test was not met for Irish Republican Army conduct that occurred in England because it was too far from Ireland which was the situs of the political uprising seeking a shift in government structure. The Second Circuit has described this part of the test as requiring a "violent political disturbance as to constitute in effect a state of civil war." *Ahmad v. Wigen*, 726 F. Supp. 389, 408 (E.D.N.Y.1989). The Seventh Circuit has looked for "on-going, organized battles between contending armies." *Eain*, 641 F.2d at 519–20.

It does not appear to be contested that there was a violent political uprising and civil war in the area now known as Bosnia-Herzegovina at the time of the alleged offenses. Other federal

courts in extradition proceedings have also recognized the violent political uprising in Bosnia-Herzegovina in this time period. *Ordinola v. Hackman*, 478 F.3d 588, 619–20 (4th Cir. 2007); *Nezirovic v. Holt* (*Nezirovic II*), 990 F. Supp. 2d 606 (W.D. Va. 2014), *aff'd*, 779 F.3d 233 (4th Cir. 2015). From 1991 to 1995, the region was impacted by civil war (Def.'s Hr'g Ex. G). The Red Cross and the United Nations were involved in prisoner exchanges and refugee services (Def.'s Hr'g Ex. C, D, E). The materials submitted by the United States with the extradition request likewise reflect that there was a civil war at the time the alleged conduct occurred (Pl.'s Hr'g Ex. 2) (including witness interviews in which the witnesses described themselves as part of the Serbian army) (Pl.'s Hr'g Ex. 6 at 16) (describing the conflict in 1992 in Večići).

The extradition record in this case supports a finding by this court that there was a violent political disturbance or uprising in Bosnia-Herzegovina at the time of Mr. Bilić's alleged actions.

3.  Incidental to the Political Disturbance

The next step for the court is to determine whether the acts charged against Mr. Bilić were recognizably incidental to the political disturbance. This requires a subjective and objective consideration by the court, though the objective consideration may usually carry more weight. *E.g.*, *Nezirovic*, 990 F. Supp. 2d at 620. To determine whether a particular offense is political, the court must look to the totality of the circumstances, focusing on such particulars as the mode of the attack and the identity of the victims. *Ordinola*, 478 F.3d at 601. Indiscriminate attacks on civilians do not fall under the political offense exception. *Ahmad*, 910 F.2d at 1066 (holding that an attack on a commercial bus carrying civilians was not a political offense); *Eain,* 641 F.2d at 521 (holding that a bombing of a market area was not incidental to an uprising). Conduct "committed for purely personal reasons such as vengeance or vindictiveness" fall outside the political offense exception. *In re Doherty*, 599 F. Supp. at 277 n. 7.

Here, Defendant and the Amici Parties[5] assert the political offense exception applies because the Complaint on its face, outlines a political offense. Mr. Bilić asserts the facts of the Complaint illustrate combatants from opposing forces were imprisoned and interrogated during a period of violent conflict and political unrest. The court agrees. Paragraph 6 of the Complaint expressly notes that the alleged conduct occurred during a period of armed conflict (ECF 1 at ¶ 6). The materials submitted by the United States to support the extradition request expressly identify all but one of the detainees as Serbian military combatants. Tepić Jelenko, Durić Milenko, and Borislav Vasiljević were part of the Serbian army (Pl's Hr'g Ex. 2 at subsec. H, I, K). One person was a Serbian civilian, Sakan Draško, an eleven or twelve-year old boy, but the materials submitted do not appear to assert acts against that civilian by Mr. Bilić but rather report another person told Sakan Draško Mr. Bilić beat others (Pl's Hr'g Ex. 2 at subsec. J). The civilian Sakan Draško was not subjected to beatings but was threatened and made to beat the other detainees. (Pl's Hr'g Ex. 2 at subsec. J).

The court received consistent evidence from both parties describing the siege on Večići. Mr. Bilić's family and his expert submitted affidavits describing the attacks by Serbian forces on the town of Večići where Mr. Bilić and his family were living in 1992 (Def.'s Hr'g Exs. G, H, I). The United States also submitted a Supplemental Statement that describe the Muslim resistance by villagers during the shelling and attack on Večići followed by a siege that continued until the fall of 1992. (Pl.'s Hr'g Ex. 6 at 16). Mr. Bilić testified at the extradition hearings about the seven-month siege by Serbian forces on the town, inclusive of crimes against Muslim residents.

The court received credible and detailed testimony from Mr. Bilić (Dec. 2, 2019 Hr'g Test. beginning at 0:42:50). In the spring of 1992, Mr. Bilić was living in a different region but returned

---

[5] The Amici Parties include Mr. Bilić's wife and two children.

to his home in Večići for a holiday. When he attempted to return to the region where he was working, all roads were blocked by Serbian forces. He returned to Večići. Serbian forces then began engaging in violence, targeted at Bosnian Muslims, in nearby towns. Bosnian Muslims were being killed and tortured. Citizens of the nearby villages fled the violence to Večići. Eventually, Serbian forces reached Večići, surrounded it, and began a siege. Every day, more than 150 grenades were launched to the village. Attacks occurred with guns, planes, and helicopters. Citizens were injured. Many died, even to minor injuries, because the village lacked medicine or doctors. According to Mr. Bilić, there was no army in the area. Bosnia had only recently announced its independence from Yugoslavia. As a result, no formal army had yet been created or was available in Večići.

The men of the village formed an alliance together, to defend their village and protect their wives, children, and families from the violence. This testimony, about the civilian militia is corroborated by Bosnia-Herzegovina's Supplemental Statement (Pl.'s Hr'g Ex. 6 at 16 (describing the Muslim resistance by villagers during the shelling and attack on Večići followed by a siege until the fall of 1992)). Being consistent with and explaining in more detail the evidence offered by the United States, without calling into question the credibility of other evidence, the court therefore considers Mr. Bilić's testimony to be explanatory evidence. Mr. Bilić described trenches they dug around the village. He described their limited weapons, with one gun shared between four men. He described their work with one person of the four-person group standing watch, with two others also present while one person slept. Each person was permitted a four-hour break each day to go home, eat, drink, bathe, and spend time with family.

In November of 1992, the citizens of the town ran out of water and fled. Mr. Bilić described the villagers' plan developed by a former teacher, to have all women and children surrender to the

Serbs and for all the men to flee and try to reach the nearest town under the control of Bosnians. Mr. Bilić (and other men) was then captured incidental to his flight by Serbian forces. He was taken to a concentration camp where he asserts, he was tortured and beaten. He was later moved to another concentration camp and was eventually released as part of a prisoner exchange facilitated by the Red Cross (Def.'s Hr'g Exs. E, D).

The court has considered Mr. Bilić's testimony and the documentary exhibits admitted in this case when such evidence was explanatory evidence. Defendant's Exhibits G, H, and I were offered and admitted for the purpose of evaluating the political offense exception, not for evaluating probable cause. As noted above, Mr. Bilić also offered some contradictory evidence in his testimony, including his denial of participating the conduct he is accused of, which the court has excluded as contradictory evidence. As noted above, the court has also not considered the recantation evidence proffered by Mr. Bilić.

The court has carefully considered the materials presented and evaluated the totality of the circumstances, including the mode of attack and the identity of the victims. The court has considered the testimony presented by Mr. Bilić at the extradition hearing and considers that testimony credible. *See Quinn*, 783 F.2d at 815 ("[T]he credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate."). The court has also considered and determined the weight to be given to all other exhibits and affidavit testimony presented by both parties.

The court concludes that the alleged acts were both subjectively and objectively political. If the conduct Mr. Bilić is accused of occurred, it was in defense of his village as part of an informal citizen's militia. That militia was defending the citizens of that village from the Serbian forces who were actively attacking the village and were engaged in an extended siege of the village.

Three of the four combatants allegedly captured and imprisoned, who Bosnia-Herzegivina relies on for its extradition request, were part of those Serbian forces (Pl's Hr'g Ex. 2 at subsec. H, I, K).

In the words of the *In re Doherty* court, "the facts of this case present the assertion of the political offense exception in its most classic form." 599 F. Supp. at 276. As in *In re Ezeta*, 62 F. 972, the alleged offenses occurred during the hostilities and occurred against enemy combatants. The temporal relationship between the conduct and the political uprising is even more compelling than in the case of *Ramos v. Diaz*, 179 F. Supp. 459. In that case, the conduct took place just after the revolution. *Id.* In this case, the alleged conduct took place in the midst of the hostilities, during a siege, during a conflict characterized by violence that was actively underway in the village and the area surrounding Mr. Bilić's village.

This case also has some similarities to *Artukovic*, 170 F. Supp. 383, which coincidentally occurred in the Balkans in another country that was part of the former Yugoslavia. In that case, militias defended villages during a civil war in conjunction with one country declaring independence from the conglomerate of countries. In this case, civilian militias were defending Mr. Bilić's village in the civil war that followed Bosnia's declaration of independence from the former Yugoslavia. In *Artukovic*, 170 F. Supp. 383, the court found that the alleged murder and the participation in murder of various individuals over a period of eighteen months met the political offense exception. The *Artukovic* case had subsequent proceedings approximately twenty years later and the political offense exception was denied for failure to present evidence in the later proceedings. Nevertheless, the earlier decision did recognize and apply the exception in the context of armed conflict and civilian militias. And as in *In re Doherty*, the alleged conduct occurred in an informal militia's response to an opposing force, the Serbian siege and its invasion and siege at Večići.

The court is compelled to note the distinction of this case from the case of *Nezirovic v. Holt*, 990 F. Supp. 2d 606. In *Nezirovic*, the district court and Fourth Circuit declined to apply the political offense exception to war crimes in Bosnia-Herzegovina. Instead, the district court affirmed the magistrate judge's determination that the defendant's alleged war crimes were not incidental to or in furtherance of political disturbance considering the victims' status as civilians. *Id.* The status of the victim as a civilian is a key distinction. That has been a deciding factor in other cases as well. *Ahmad*, 726 F. Supp. at 402–03 (reviewing the body of case law and State Department policy regarding the application of the political offense exception to civilians); *In re Doherty*, 599 F. Supp. at 274–75 (discussing the distinction between offenses committed against civilians and organized military forces). In this case, as described above, the materials submitted to support the request for extradition assert the acts by Mr. Bilić were against military victims (Pl's Hr'g Ex. 2 at subsec. H, I, K). Two of those victims assert Mr. Bilić was one of several who beat them, although the references are general in nature, referring to "they." One victim does not mention Mr. Bilić at all (Pl's Hr'g Ex. 2 at subsec. K). One document was submitted by a civilian victim. (Pl's Hr'g Ex. 2 at subsec. J). That witness identifies Mr. Bilić but does not identify him by face or by conduct (Pl's Hr'g Ex. 2 at subsec. J). That civilian, in his three interviews, does not assert any conduct by Mr. Bilić against him (Pl's Hr'g Ex. 2 at subsec. J). The civilian asserts in one of his interviews that he was told Mr. Bilić's name by a guard (Pl's Hr'g Ex. 2 at subsec. J).

While the scope of the court's role in determining whether to certify Mr. Bilić for extradition is limited, in objectively looking to the facts and circumstances surrounding the alleged crimes, the court finds the acts alleged in this case were incidental to, in defense against, the violent political disturbance including civil war, and rebellion continually occurring in the region and in the village of Večići at the time of the alleged offenses. The alleged conduct occurred against

military combatants in the course of that conflict. The court therefore finds the offenses for which Mr. Bilić is being accused are included within the definition of political offenses and are therefore not extraditable offenses under the Treaty.

### E.  Role of the Convention Against Torture and Its Definition of Torture

The court necessarily also needs to consider the role of the Convention Against Torture. The United States alleges that Mr. Bilić's conduct meets the definition of "torture" within the Convention Against Torture and he is therefore extraditable (Pl.'s Hr'g Ex. 1). The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (the CAT), was finalized in New York on December 10, 1984 and entered into force June 26, 1987 (for the United States, November 20, 1994), S. Treaty Doc. No. 100–200, 1465 U.N.T.S. 85 (Pl.'s Hr'g Ex. 1). As recognized in other courts addressing extradition, the United States and Bosnia-Herzegovina (and more than 140 other countries) are signatories to the CAT. *In re Nezirovic*, 2013 WL 5202420, at *6. Article 8 of the CAT declares that acts of torture, attempts to commit torture, or any complicity or participation in torture are offenses in the extradition treaties between the signatory parties. United States courts have recognized that as a result of the CAT, torture has become an extraditable offense under the 1902 Treaty. *In re Nezirovic*, 2013 WL 5202420, at *6. The United States asserted at the December 2019 Extradition Hearing that the CAT provides an "exception to the exception," meaning that if the events meet the definition of torture, then the offense is extraditable even if it is a political offense.

The CAT defines "torture" as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public

official or other person acting in an official capacity." CAT, Art. 1, § 1. The official capacity component of this definition is significant. The United States has issued guidance to its own agencies describing the difficulty in the international community in reaching a consensus on the definition of torture for the CAT. Cong. Res. Serv., U.N. Convention Against Torture (CAT): Overview & Application to Interrogation Techniques at 1–2 (Jan. 19, 2010). The detailed guidance notes that despite the deplorable nature of certain acts, if a private individual causes severe pain or suffering "absent the instigation, consent, or acquiescence of a public official such action does not constitute 'torture' for purposes of CAT." *Id.*

Federal courts have similarly looked for the official nature of the alleged conduct. Applying the definition of torture in the CAT and its requirement for a person "acting in an official capacity" in a slightly different context, under the CAT's provision to not extradite people to countries where they may be subjected to torture, United States courts have required some indication that the conduct alleged to be torture be made "under the color of law." *E.g.*, *Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014) (reviewing related cases and agency decisions requiring an official sanction or person acting under the color of law.) "[T]he government acquiescence need not necessarily be an officially sanctioned state action; instead, an act is under color of law when it constitutes a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* As discussed later in this section, federal courts looking at torture as the basis for extradition have similarly looked to the requirement of some official act under the color of law, although with less detail than that articulated in the *Garcia* court. *In re Extradition of Azra Basic*, Case No. 5:11-MJ-5002-REW, 2012 WL 3067466, at *11 (E.D. Ky. July 12, 2012) (finding "[t]o the extent the torture definition, via international law, requires an official capacity action or actor, the evidence provides probable

cause of such a nexus here" where the person to be extradited had a recognized leadership role and gave orders to other soldiers to engage in torturous conduct); *In re Extradition of Mujagic*, 990 F. Supp. 2d at 219 (finding the CAT's definition of torture met by a person who "was acting in his official capacity as a commander of an organized militia at the time of the alleged events").

The materials submitted in support of extradition in this case do not address this final element regarding "official capacity"—that the conduct be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." The witness testimony materials submitted by the United States do not address this question (Pl.'s Hr'g Ex. 2). Only two of the witness statements reference a militia. Sakan Draško states he was imprisoned by "Muslim-Croatian formations" (Pl.'s Hr'g Ex. 2 at J), and Borislav Vasiljević references "Muslim Soldiers" (Pl.'s Hr'g Ex. 2 at K), but neither include an explanation as to whether or not the formations were consented to by public officials or other persons acting in an official capacity. Likewise, the Decision from the presiding Banja Luka District Court also references "Muslim-Croat forces" but does not include an explanation if such force was with the consent of a public official or person acting in an official capacity (Pl.'s Hr'g Ex. 2 at B). The Supplemental Statement from the prosecutor's office in Banja Luka characterizes the atmosphere in Večići in 1992 as one of a resistance by Muslim villagers. (Pl.'s Hr'g Ex. 6 at 16), not one of an organized army or an arm of the state acting under the color of law.

Of particular importance is the lack of assertions that Mr. Bilić was a person in a leadership position or acting under any state authority. As noted previously, the witnesses describe Mr. Bilić in general terms as one of a group of men, with few specifics and generally referring to "they" (Pl's Hr'g Ex. 2 at subsec. H, I, J). One witness does not mention Mr. Bilić at all (Pl.'s Hr'g Ex. 2 at subsec. K). And the one civilian witness makes only a single mention of Mr. Bilić in his three

interviews, without identifying him affirmatively as being a person he witnessed in the alleged beatings. (Pl's Hr'g Ex. 2 at subsec. J).

After reviewing the witness testimony in detail, the court concludes that the materials submitted shed no light on the organizational structure surrounding the alleged conduct or the hierarchy of the men who allegedly conducted beatings. None of the written testimony indicates that Mr. Bilić was acting as the official or in any official capacity. The only evidence presented about any hierarchy or officials within the village militia was from the testimony of Mr. Bilić (Dec. 2, 2019 Hr'g Test. at 0:51:00 to 0:57:03). He testified that his role in the civilian militia defending the village was a civilian activity, with no chain of command or public official or other person acting in an official capacity. Mr. Bilić testified that there was a retired army officer in the village but that retired officer declined to give any orders to the civilian militia members during the siege. As noted earlier in this order, this testimony is consistent with and provides explanatory detail to the information provided by the United States, particularly the Supplemental Statement (Pl.'s Hr'g Ex. 6), and is therefore considered explanatory evidence, not contradictory evidence. After reviewing all evidence presented, there is insufficient evidence to conclude that Mr. Bilić was acting in an official capacity, under the color of law, such that he is extraditable through the CAT.

Again, this case is distinguishable from *In re Nezirovic*, 2013 WL 5202420. In that case, the court found that a prison guard was a member of a recognized paramilitary group, the HVO, who allegedly beat prisoners in a prison camp was extraditable because the conduct on behalf of the HVO met the definition of torture. *Id.* at *7. This case involving Mr. Bilić does not indicate the alleged conduct took place at any organized prison camp nor are there any indicia of a hierarchy within the house or the village, such as a guard acting on behest of his military superiors. This case is also distinguishable from other cases such as *In re Extradition of Mujagic*, where the person

being extradited engaged in torturous conduct "in his official capacity as a commander of an organized militia." 990 F. Supp. 2d at 219. In *In re Extradition of Azra Basic*, that court also noted there were "significant indications that Azra had leadership and an official role relative to the Croatian soldiers." Case No. 5:11-MJ-5002-REW, 2012 WL 3067466, at *11 (E.D. Ky. July 12, 2012). This is not that type of case. Insufficient information was presented to conclude that Mr. Bilić had any official capacity or was acting under the direction of any state authority.

In conclusion, the materials submitted do not support a finding that the definition of "torture" under the CAT has been met in this case. The court understands the conduct alleged included beatings and other events causing pain and suffering. The court does not condone such conduct. However, after evaluating the evidence submitted to support the extradition request and the requirements to meet the definition of torture as used in the CAT, the torture exception via the CAT to the political offense exception does not apply under the facts of this case.

## F.  Probable Cause and Other Issues Not Considered

Having denied certification on the fourth of the five requirements for certification, the court has not considered the probable cause requirement. The parties briefed those issues extensively at ECF 28, 40, 45, and 55. The court recognizes that the parties vigorously contest the adequacy of the charging documents by Bosnia-Herzegovina. The parties also contest the adequacy and admissibility of the recantations by three of witnesses relied upon by the Bosnia-Herzegovinian government. However, the court declines to adjudicate those issues having decided the matter on other grounds. The court recognizes Mr. Bilić's position regarding recantation evidence, which were proffered to defeat probable cause, but declines to revisit that issue in issuing this decision.

The court has also not considered several other issues. The parties briefed the doctrine of refoulement at ECF 67 and 68. Amici in this case assert that the certification of extradition must

be denied because Defendant would be sent to a country whose current government has been convicted of war crimes and that Defendant would be subjected to torture. In the same area of inquiry, the court has not considered the rule of sociality identified by the United States in one of its response briefs (ECF 79 at 1 n. 1). The court has not considered the issue of the statute of limitations briefed by the parties. The court has not considered the issue raised at the December 2019 hearing of whether a citizen of the United States can be extradited pursuant to a particular 1978 convention discussed at the hearing. Again, having decided this matter on other grounds, the court does not address those additional bases for denying the certification of extradition.

## CONCLUSION AND ORDER

The court DENIES Defendant's Motion to Dismiss (ECF 64) because there is a valid and enforceable treaty. However, the crimes charged are subject to the political offense exception under the facts of this case and are therefore not extraditable offenses under the 1902 Treaty. The crimes charged do not meet the definition of torture under the CAT are therefore not extraditable offenses under the CAT. The court therefore DENIES the request for extradition and DISMISSES the Complaint against Defendant.

DATED this 2 September 2022.

Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah